**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Fred MUSCARELLA, Carl Veller, Anthony Vymola and Ronald More,
Defendants-Appellants.**

Nos. 77–2120 to 77–2122.

United States Court of Appeals,
Seventh Circuit.

Argued May 25, 1978.

Decided Sept. 20, 1978.

Rehearing and Rehearing En Banc
Denied Oct. 20, 1978.

---

1. Additionally, three judges did not participate in the consideration or disposition of the case.

Patrick A. Tuite, Chicago, Ill., Julius L. Echeles, Chicago, Ill., John T. Theis, William J. Martin, and Robert A. Merrick, for defendants-appellants.

William G. Otis, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before SPRECHER and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Following a jury trial, defendants-appellants Muscarella, Veller, Vymola and More were convicted of conspiring to and using extortion to collect a gambling debt in violation of 18 U.S.C. §§ 2 and 894.[1] In chal-

---

* The Honorable William J. Campbell, Senior United States District Judge for the Northern District of Illinois, is sitting by designation.

1. The district court sentenced Ronald More to concurrent terms of three years imprisonment, and sentenced Fred Muscarella and Anthony Vymola to concurrent terms of 15 months. Carl Veller was sentenced to concurrent terms of nine months.

lenging their conviction on appeal the defendants present the following questions: (1) whether the evidence was sufficient to support the convictions; (2) whether the conduct of the prosecution constituted a deprivation of the defendants' right to a fair and impartial trial; (3) whether the trial court abused its discretion when it denied the defendants' request to see and use the prior criminal record of the prosecution's chief witness; (4) whether the trial court's jury instructions were correct; (5) whether the trial court erred in its separation procedures; and (6) whether the facts of this case constitute an 18 U.S.C. § 894 violation. We affirm.

## I. Sufficiency of the Evidence

Because the appellants challenged the sufficiency of the evidence, we set it forth in some detail, noting the role each party played in the extortionate transactions.

The incident resulting in these convictions occurred during a one week period in March, 1977. Ronald More owned the Embassy Carpet Company in Chicago; however, as a sideline business he ran a gambling operation. One of his clients in the gambling operation was Warren Davies, the extortion victim in this case, who owed More as much as $10,000 on his losing bets. Richard Moore, a gambling acquaintance of Ronald More, was the chief prosecution witness.[2] Muscarella, Veller and Vymola were Chicago policemen assigned to the district encompassing Ronald More's business. They were acquainted with More and would often stop by his store during the day when they were on duty. Vymola on occasion patronized More's sideline enterprise.

In March, 1977, Davies placed a bet with Ronald More. More informed Davies at that time that he expected payment on Davies' other debts and instructed Davies to deliver the money to "Tony the Cop" at a professional basketball game Davies was to attend that evening. Davies knew that the

nickname "Tony the Cop" referred to Anthony Vymola because the two men had met through More on several occasions over the past two years. Although Davies told More he would pay Tony, he did not attend the game. The next day when Davies informed More he could not make good his debt he was told, "Okay, now—now you owe me twice as much. You are dead." On a recent previous occasion More warned Davies that he should pay up because "I don't want to see you end up with your arms and legs broken, stuffed into a trunk at the airport." Davies decided that under the circumstances prudence dictated that he leave the area temporarily. He began to drive to California, but stopped near Denver and contacted FBI agents.

Meanwhile, to collect the debt, Ronald More enlisted the aid of Richard Moore, his gambling acquaintance. Ronald More had Richard Moore, posing as "Angelo," a fictitious mob's chief "collector," make phone calls to Davies' brother Tom and Davies' fiancée, Audrey. In making these phone calls veiled threats were made by Angelo regarding members of their families. The front window of the Davies' family business was smashed that same evening and inside Tom Davies found a brick and bottle that appeared to be a simulated molotov cocktail. Also, a window at his home was smashed that night. Angelo testified that More told him that his "copper friends" broke the windows.

The next day Davies flew back to Chicago on the advice of the Denver FBI. He checked into the O'Hare Hilton, and FBI agents moved into an adjoining room. Davies called More, and the FBI taped the threats made by More during that phone call. Angelo and More continued their threatening phone calls to Davies' brother and fiancée.

The following day More instructed Angelo to "get nasty with" Davies. Angelo told Davies that his brother's house and business would "go up in smoke" and that his fi-

---

2. Moore pleaded guilty and agreed to testify in exchange for the government's promise to inform the sentencing judge of his cooperation.

ancée's daughter would "disappear" if payment wasn't made. Davies called Angelo to say he was ready to tender partial payment. Around 5:00 p.m. Angelo called More for instructions, and a three-way conversation ensued between Angelo, More and a "Tony," identified to Angelo as one of More's "copper friends" who was there. Tony suggested that collection of the partial payment be made at the Golden Arch restaurant, across the street from More's business. Tony said "Carl" would act as lookout. At 6:30 p.m. Angelo called Davies and told him to be at the restaurant to 7:00 p.m. Davies did not show up but Carl Veller and Fred Muscarella did appear. At 6:40 that evening, FBI Agent Leraas began a surveillance on Embassy Carpet, and five minutes later saw Anthony Vymola and another man enter the store. Around 7:00 p.m. a series of calls were made to find out why Davies failed to show up at the restaurant. During a call by Angelo to More, there was another three-way conference between Tony, Angelo and More, during which Tony suggested that Davies should be tortured. Davies called later to say he would not come into More's neighborhood because he was afraid. More, Tony and Angelo worked out a plan whereby collection would be made that evening at the O'Hare Hilton where Davies was staying.[3] Richard Moore, "Angelo," testified that Tony suggested that if anyone got caught they should say they were helping a friend collect a legitimate debt and that they knew nothing about a gambling debt.

An FBI agent saw three men leave Embassy Carpet at 7:55 p.m. Around 8:30 p.m., an FBI agent observed Vymola listening at Davies' hotel room door and saw Muscarella pause by the door a short time later. Then Vymola left the hotel and went to his car, which was parked in the hotel's lot. Muscarella phoned Davies and told him to come downstairs to the lobby.

Davies met Muscarella and Veller in the lobby. The three men sat together but Davies refused to turn over any money, saying, "I ain't dealing with anybody but this guy Angelo. He is the guy who has been threatening everybody." Veller stood up then and walked around for a moment. Muscarella told Davies he would have to pay "to show good faith." Veller returned to the two men and asked Davies if it would "do any good if I said that I was Angelo." Davies questioned whether Veller was Angelo and continued his refusal to deal with the two men. Veller told Davies, "You are going to have to pay us the money to get Angelo off of your back."

While Muscarella and Veller were talking inside with Davies, Vymola and More were crouched outside behind Vymola's car. When they entered the car FBI agents arrested them at gunpoint. Observing the incident through the hotel lobby windows, Veller and Muscarella ran out to the car, shouting that they were Chicago police officers—whereupon they were also arrested.

More testified at trial and admitted his involvement in the extortion, explaining that he was under pressure to pay his own "Chicago Crime Syndicate" debts. He testified that he had asked the policemen for help, but that they did not know the nature of the transaction in which they were involved. He also said he alone smashed Davies' brother's windows, and that he borrowed Veller's car to do it.[4]

Muscarella's mother-in-law testified that on the evening the windows were broken, Muscarella had taken his son to the hospital to treat the boy's burned hand. She testified that following their return from the hospital he stayed with his son the rest of the night, and thus could not have been involved in the window smashing incidents.

---

**3.** Initially Tony's reaction to the O'Hare plan was to say that "there is no way we are going to go to the suburbs . . . if we can't collect the money here in the district, forget it." Only after More assured him that O'Hare was in the city did Tony agree to go.

**4.** Vymola and Muscarella used the car when they "moonlighted" as carpenters. The defense asserts that the soft drink bottle used to simulate the molotov cocktail was taken from the debris that cluttered the car, and thus it was natural that Muscarella's fingerprints would appear on the bottle, even if he did not throw it through the window.

Vymola's mother testified that her son picked up gifts at her house, which is 12 miles away from Embassy Carpet, around 5:45 p.m. the evening of the three-way phone conversations involving plans for the O'Hare Hilton collection. The defense argues that he could not have made the round trip in rush hour traffic in time to participate as "Tony" in the 5:00 p.m. phone call and then be seen entering the store at 6:45 p.m.

## A. *Anthony Vymola*

The evidence amply demonstrates Vymola's involvement in the conspiracy and extortion. More told Davies that "Tony the Cop" would collect the debt at the basketball game. Davies testified he understood the nickname to refer to Tony Vymola whom he had met on previous occasions. More brought "Tony" into the first three-way conversation with Angelo by saying he wanted one of his "copper friends" who was there to take part in the call.

The jury could fairly infer that the "Tony" who took part in the telephone conversations was the same "Tony the Cop" who was to make the collection at the basketball game. Tony Vymola's appearance with his car at the O'Hare Hilton, after the "Tony" on the phone said he would drive there, supports the inference. The testimony of his mother only showed that it may have been difficult for him to have made the 24 mile round-trip in one and a half hours,[5] not that it was impossible. The jury was entitled to resolve any ambiguities raised by the testimony in favor of the government.

## B. *Fred Muscarella*

The evidence set forth above shows Muscarella's involvement in the illegal transactions here. He was with Veller at the Golden Arch "drop" site. His fingerprints were on the bottle that was thrown through the window of the Davies' business establishment. Angelo testified that More said his "copper friends" threw the bottle. Muscarella was seen "casing" Davies' hotel room. Later, while talking to Davies at the hotel, he exhibited no concern that Angelo had made threats to Davies in connection with the supposedly innocent debt he was helping to collect. In fact, he told Davies that Angelo "[is] probably one of our top collectors." This series of events discloses sufficient evidence from which the jury could determine beyond a reasonable doubt that Muscarella had entered into a conspiracy with the others and was guilty of the substantive offense.

## C. *Carl Veller*

We believe that viewing the evidence in the light most favorable to the government there was sufficient evidence from which the jury could justifiably infer Veller's criminal involvement in the venture. He appeared at the Golden Arch restaurant at the exact time Tony told Angelo that "Carl" would serve as lookout for the "drop." When he and Muscarella met with Davies during the O'Hare collection attempt, he expressed no surprise when Davies referred to the threats that Angelo had made for failure to pay his debt. Instead, Veller told Davies, "[Y]ou are going to have to pay us to get Angelo off your back."

We conclude that viewing the evidence in this case in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), there was sufficient evidence for the jury to find that the defendants were guilty of the crimes charged.

## II. Prosecutorial Misconduct

The defendants also argue that the misconduct of the prosecutor in eliciting certain testimony from witnesses and in his closing argument deprived them of a fair and impartial trial, thereby necessitating a reversal of the guilty verdict.

---

5. The first call apparently ended about 5:15 p.m., and the FBI agent saw Vymola enter the store at 6:45 p.m.

## A. Vymola's Refusal to Sign the Waiver Form

During the direct examination of FBI Agent Leraas, the prosecutor, apparently inadvertently, elicited the statement that upon arrest Vymola indicated he "preferred not to sign" a "waiver of rights" form. Defense counsel objected and indicated that he would "like to be heard later on." The agent then went on to add that Vymola gave his accounting of the incident. Subsequently, the defense attorney made a motion for a mistrial. The government acknowledged that the testimony concerning the waiver was improper and suggested that a curative instruction be given. The trial court noting that there had been nothing more than a mere reference in the testimony to the "waiver of rights form" denied the motion for a mistrial. Vymola asserts that any reference to the invocation of these rights amounts to constitutional error depriving him of a fair trial, citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). In both of those cases the defendants did in fact exercise their right to remain silent once they had invoked the right, which is not the situation in the instant case. In addition, we do not read those cases as adopting a *per se* rule; rather, they look to the circumstances surrounding the statement. One of those circumstances to be considered we believe is that the defendant here chose not to exercise his right to remain silent, even though he had not signed the "waiver of rights" form.

Finally, we note that the statement by the agent may fairly be characterized as a passing remark and that under the circumstances there is no reasonable possibility that that testimony contributed to Vymola's conviction. The jury could not have inferred that by his refusal to sign the form he was trying to hide his guilt in silence, for if the jury understood the significance of the reference to the waiver form, they must have also realized the significance of Vymola's voluntary statements immediately following. While the benefit of hindsight teaches that the prosecutor might be faulted for not anticipating the response and alerting the witness to bar its use, looking to all the circumstances and the other evidence clearly establishing his criminal role in the transaction, it is clear that the inadvertent elicitation from the witness that Vymola "preferred not to sign anything" does not constitute reversible error.

## B. Police Protection Testimony

When Davies was first put on the witness stand, the government questioned him as to the benefits he had received from the government in return for his testimony in the case. The jury is ordinarily entitled to know all the consideration a witness has received from the government in exchange for his agreement to testify. *DeMarco v. United States*, 415 U.S. 449, 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974); *United States v. Bastone*, 526 F.2d 971, 981 (7th Cir. 1975), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976). The questions in this case elicited the information that Davies had received certain financial assistance and protection for himself and his fiancée's family. Defense counsel immediately objected, and the judge instructed the jury, "[T]he jury will disregard that." When the defense made a motion for a mistrial based on the statement, the trial judge offered to give a curative instruction, but the defense counsel declined on the theory that they did not wish to emphasize the matter.

Defendants assert that the implied existence of threats fatally infected the trial necessitating reversal. In support of their contention they direct us to *United States v. Love*, 534 F.2d 87 (6th Cir. 1976), and *United States v. Peak*, 498 F.2d 1337 (6th Cir. 1974). We find these cases inapposite. The *Peak* case involved totally unsubstantiated references to threats allegedly made by defendant's relatives, and the *Love* case similarly involved the unsubstantiated suggestion by the prosecutor that defendant worked for the "Mafia." In those cases the hint of violence was explicitly linked to the defendant, and the jury verdict suggested that the statements had been a factor in

bringing about the convictions. What is important to note from these cases is that the court evaluated the question of prejudice in the context of the whole record. In the case at bar, there did exist a record that the defendant had been threatened. The testimony in the case did not link his need for protection only to the defendants. More had testified that Davies' failure to pay his debts had caused More to fall behind in his payments to the "Chicago Crime Syndicate" and that as a result he (More) had been threatened. Thus the jury could have inferred that the protection Davies needed was to insulate him from the "Syndicate" and not the defendants. It is also important to note that the judge gave an immediate instruction to the jury to disregard the remark, and counsel chose not to have a later curative instruction given. At no time in the trial after this was there any further mention of the need for protection. Further, we note that the jury convicted the defendants on all of the charges and that there was ample independent evidence justifying the conviction. The verdict itself does not suggest that the one isolated statement was a factor in bringing about the convictions.

## C. Comment on Failure to Call Witness and to Testify

■ During closing argument, the prosecutor summed up the evidence he felt demonstrated that defendant Tony Vymola was the same "Tony" involved in the three-way telephone calls. In doing so the prosecutor pointed out the inconclusive nature of the alibi testimony that because Vymola had traveled to his mother's house after work that day he could not have been at Embassy Carpet at 5:00 and 6:45 p.m. Government counsel went on to say that even if Vymola had been working at the time, he still could have stopped by Embassy Carpet at the

necessary times, adding "[W]e didn't hear from his partner that he was at work at that time and that he wasn't somewhere else." There was no objection.

Vymola contends that the prosecutor's statements represent an attempt to suggest to the jury that Vymola had the burden of producing evidence to show he was not at work. Muscarella argues that since he was Vymola's partner the remarks impermissibly drew the jury's attention to his failure to testify.

Whether Vymola had been on or off-duty at the necessary times had never been an issue in the case, and so the prosecutor's comments were superfluous and were in the nature of a tangential comment. The incongruous quality of the comment was readily apparent, since Vymola never contended he was on duty at the time and in fact presented uncontested evidence showing that he was *not* on duty. Moreover, the trial judge gave a final jury instruction bearing on the incident, specifying that the defendant did not have the burden of production of evidence or of proving his innocence.[6] Taken together, the circumstances demonstrate no prejudice to Vymola stemming from the prosecutor's comments.

■ The argument that the prosecutor's statements constituted indirect comment on Muscarella's failure to testify raises a more difficult question. Comments on a defendant's failure to testify, even those of the most indirect nature, are highly disfavored, but are not automatic grounds for reversal. *United States v. Buege*, 578 F.2d 187 (7th Cir. 1978). We must review this statement to determine whether it was manifestly intended to be or was of such a character that the jury naturally and necessarily took it to be a comment on Muscarella's failure to testify. *United States v. Buege, supra*, at 188; *United States v. Lyon*, 397 F.2d 505 (7th Cir.), *cert. denied*, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968).

**6.** The jury was instructed as follows:

Now, we had during the closing arguments some question about whether or not certain evidence was produced or not produced. Now, the law does not require a defendant to prove his innocence or to produce any evidence. And he may rely on evidence brought

out on cross-examination of witnesses for the government. And if the government has failed to prove the defendant or any particular defendant guilty beyond a reasonable doubt then your duty would be to acquit such defendant or defendants.

■ The comment itself makes no reference to Muscarella by name, only referring to Vymola's partner. The fact that Muscarella's own attorney did not object at the time the statement was made suggests that it would not "naturally and necessarily" be interpreted as referring to Muscarella and as a comment on his failure to testify. The potential problem as to Muscarella was not brought to the court's attention until later when Vymola's attorney objected to the statement in regard to his client and Muscarella's attorney joined in the objection. When the issue was raised, the prosecutor denied having any intention of pointing out that Muscarella did not take the stand. We believe that, viewing the comment in the context of the whole record and its probable effect on the jury, sufficient evidence exists to find that even if the comment was error it was harmless beyond a reasonable doubt. *United States v. Hansen*, 583 F.2d 325 (7th Cir. 1978).

### D. *Voice Exemplars*

■ Vymola points to another incident which he asserts represents an attempt by the prosecution to shift the burden of producing evidence to the defendants. Testimony revealed that although the government took voice exemplars from Vymola, Richard Moore never identified Vymola's voice as that of the "Tony" in his calls to More. In closing argument, Vymola's attorney pointed this out to the jury and asked rhetorically why the government failed to use the voice exemplars at trial. During rebuttal, government counsel responded, admitting that Moore could not match the voice on the phone to that on the voice exemplar because he had heard the phone voice so long ago and for only a brief time. However, the prosecutor went on to add:

> And that is a two-edged sword anyway. If Rick Moore never talked to Tony Vymola and never met Tony Vymola and there were voice exemplars of all of the defendants including Mr. Vymola, all Mr. Martin had to do was to have him try to pick out Mr. Vymola's voice from among

those exemplars, and there is no way in the world that he could have done it.

MR. MARTIN: I object, your Honor. He is putting the burden on us and he knows that that is not the law. I don't have to do anything.

THE COURT: The defendants, of course, have no burden to produce evidence on their own.

MR. HENDERSON: I am not suggesting that they do, your Honor.

THE COURT: Yes. All right.

MR. MARTIN: That's exactly what he said.

THE COURT: Well, one at a time here. And it is his turn at the moment.

MR. HENDERSON: Why didn't Mr. Martin do that?

MR. MARTIN: Objection, your Honor. The Court just ruled on that. The Court just ruled that we did not have to produce evidence of any kind. It is their case. That they have to prove what they allege.

THE COURT: Go ahead, counsel, and argue your case.

MR. HENDERSON: But he didn't do it because that was Tony Vymola's voice during the phone call.

MR. ONESTO: Judge, I will have to object. Now, this is the fourth time that he has gone against your ruling.

THE COURT: I will sustain the objection.

Defendant Vymola argues that the statements of the prosecutor were an attempt to suggest to the jury that defense did not use the voice exemplars because Richard Moore would have identified defendant Vymola's voice as "Tony" and thus was an improper attempt to shift the burden of producing evidence to the defendants. While the prosecutor's statement could be interpreted as suggesting this, such an interpretation is inconsistent with the explanation the government already gave as to why they had not used the exemplars: namely, because Richard Moore would not be able to identify the voice as that of defendant

Vymola.[7] To argue that the government witness would not be able to identify the voice for the government but would be able to identify it if the defendants were to call him is at best strangely inconsistent and unlikely to have had any persuasive effect on the jury. Defendants' critical contention, however, is that the government was attempting to shift the burden of producing evidence. To the extent that the prosecutor's argument can be interpreted as doing so, the government was in error. However, we note that in the present instance the defense counsel immediately objected and the court instructed the jury that any such suggestion by the government was incorrect. The court again at the close of the case instructed the jury as to the allocation of the burden of proof, repeating that the defendants had neither the burden of proving their innocence nor of producing any evidence. We conclude that the trial judge's contemporaneous, proper statement of the law eliminated any possible prejudice caused by the prosecutor's improper comment. When the incident is viewed in the context of the whole record, any error that occurred was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## III. Davies' Prior Criminal Record

■ Before Davies took the stand, defense counsel requested that the government furnish them with a copy of Davies' criminal record to discover whether he had ever been engaged in "deceptive practices . . . or fraud or theft or anything to that effect," that could be used by the defense for impeachment on cross-examination. The government opposed the request on the ground that nothing in the record was relevant to his credibility, the record was comprised of only misdemeanors and juvenile convictions over 10 years old, thus within the proscription of Fed.R.Evid. 609.[8] The court was given a copy of the record. After examining it, the court agreed with the government and ruled that defense counsel would not be allowed to use the record since "none of this would have the slightest probative value in connection with this . . . except to prejudice the jury. . . ." The record was marked as an exhibit and defense counsel was told that they would be allowed to see a copy of the record at the conclusion of the trial and that it would be available for review if they chose to appeal the case.

The defendants argue that it was an abuse of discretion for the judge to refuse to allow them to use the record to impeach the prosecution witness and to do so without holding a hearing to allow defense counsel to know the nature of the offenses and to argue their relevance to the judge. *United States v. Mahone*, 537 F.2d 922 (7th Cir. 1976), commends the practice of holding a hearing, particularly when the admissibility decision depends on a balancing of the

---

7. The government in its brief argues that the statement "there is no way in the world that *he* could have done it," refers to Richard Moore's admitted inability to identify the voice.

8. Rule 609(a) and (b) provides:
   (a) General rule.—For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination *but only if* the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statements, regardless of the punishment. (Emphasis added.)

(b) Time limit.—Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to use such evidence.

probativeness of the evidence against its prejudicial effect. In the present case, when the government resisted defense counsel's access to the record, it was stated that the convictions were misdemeanors or juvenile convictions all over the 10 year limit and thus the record on its face would not ordinarily be admissible for impeachment purposes unless the judge found that the "interests of justice" required admissibility. The judge examined the record, stated his reasons for refusing admission and preserved the record for review on appeal. While we agree with defendants that the better practice would have been to hold a hearing on the admissibility of such evidence, the admission of Davies' record under the circumstances was within the discretion of the trial judge, 3 Weinstein's Evidence ¶ 609[03], and we find no abuse of that discretion.

## IV. Jury Instructions

The defendants also raise various objections in regard to the jury instructions, objecting to some that were given and arguing that others should have been given.

■ Their first objection pertains to the "knowledge" instruction given by the court, specifically the phrase, "No person can intentionally avoid knowledge by closing his eyes to facts which should prompt him to investigate." (Jury Instruction No. 4.05, 33 F.R.D. 523 (1963)). The defendants argue that the instruction improperly allows the jury to presume that the defendants had knowledge and intentionally closed their eyes. We disagree. It only instructs the jury that when a defendant claims that his actions were not done knowingly or were done without knowledge of the essential facts, as the defendants in the present case argued, the jury is entitled to look to the evidence to determine whether there were facts that should have prompted the defendant to investigate and that the defense of lack of knowledge is not available if the defendant has a conscious purpose to avoid

enlightenment. We find no error in the instruction itself and find that it was proper to give it under the circumstances of this case.

■ The defendants also argue that it was error for the trial judge to refuse to give their tendered instruction on "impeachment by omission." [9] The defense counsel argued to the trial court that such an instruction was necessary, since certain prosecution witnesses testified to things at trial which had not appeared in their pre-trial statements. The trial judge did not give defendants' proposed instruction, giving instead a standard instruction on impeachment by inconsistent statements (LaBuy 6.06-1, 33 F.R.D. 523). However, he also noted that defense counsel was free to argue and point out to the jury in closing argument the inconsistencies or omissions in the testimony of the witnesses. We agree that witness credibility was a central issue in the case; however, the court's extensive and accurate jury charge setting forth the guidelines on witness credibility and impeachment were sufficient to properly and fully instruct the jury. We find no error in the court's refusal to give the instruction preferred by defendants.

## V. Jury Separation

■ Prior to the time the jury began its deliberations in the afternoon of September 28, 1977, the court indicated that if both the prosecution and the defense agreed the jury could begin deliberations that same day, but that the court would allow them to go home at 9:30 p. m. rather than requiring the jury to continue deliberations into the late evening hours. The alternative of adjourning for the day and beginning deliberations the next day was also mentioned by the judge. After some discussion about other matters the judge was questioned by one of the defense attorneys about the length of time the jury would deliberate that evening, and the judge repeated that deliberations would terminate at 9:30 p.m., "if everyone

---

**9.** Defendants' proposed instruction read:

The testimony of a witness may also be discredited or impeached by the fact that

significant matters to which the witness testified at trial were not contained in his previously made statements.

agrees." After all counsel agreed to the "sealed verdict" procedure, the jury was brought back, the court instructed them, and they began their deliberations. Before counsel left the courtroom, the judge discussed the details with defense counsel regarding the 9:30 p.m. termination procedure, indicating that the marshal would check to see if the jury had reached a verdict, and if they had not and the jury indicated that it did not expect to reach one within a short time, the marshal "will simply tell them that they are permitted to go home, that they will not discuss the case with anyone at their homes or permit [any]one to discuss it with them and that they are to be back at 9:30 in the morning." There were no objections or suggestions by any counsel.

On appeal the defendants argue that it was error for the judge to allow the jury to separate once they began their deliberations and to delegate to the marshal the delivery of instructions at the time of separation. Our recent decision of *United States v. Arciniega*, 574 F.2d 931 (7th Cir., 1978), held that "the decision to allow a jury to separate rests within the sound discretion of the district court, and that for separation to constitute reversible error there must be an objection supported by specific reasons . . . and a showing that the defendant was actually prejudiced by reason of the separation." At 933. We find no abuse of discretion in the judge's decision in the instant case to allow the jury to separate at 9:30 p.m., particularly in the absence of any objection from counsel or showing of any prejudice. While we do not recommend the practice, absent any objection or showing of

prejudice, we also find no error under the particular circumstances of this case in the court permitting the marshal to remind the jury of the instruction previously given by the court not to communicate with anyone about the case.

## VI. Validity of the Statute

Defendants Veller, Vymola and Muscarella also challenge the validity and applicability of 18 U.S.C. § 894[10] to the events in this case, which occurred solely within Illinois. They argue that it is beyond the power of Congress to make a local crime a federal criminal offense. Chapter 42, of which Section 894 is a part, represents a comprehensive legislative attack on all types of extortionate credit transactions. Congress expressly found that "even where extortionate credit transactions are purely intrastate in character, they nevertheless directly affect interstate and foreign commerce."[11] We conclude that the collection of local gambling debts by extortion is within the ambit of Section 894 and that Congress acted within its power when it chose these means to deal with the problem. *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *United States v. Annerino*, 495 F.2d 1159, 1165 (7th Cir. 1974).

For the reasons given above the convictions are hereby affirmed.

AFFIRMED.

**10.** 18 U.S.C. § 894 reads in pertinent part as follows:

§ 894. Collection of extensions of credit by extortionate means

(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit or,

(2) to punish any person for the nonrepayment thereof,

shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

(b) In any prosecution under this section, for the purpose of showing an implicit threat

as a means of collection, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punishment by extortionate means.

**11.** Pub.L. 90–321, Sec. 201(a)(3); *see* Conf. Rep.No. 1397, 90th Cong., 2d Sess. (1968), [1968 U.S.Code Cong. & Admin.News pp. 1962, 2026].