UNITED STATES of America, Appellee,

v.

Walter HIGGINBOTHAM, Appellant.

No. 76–1398.

United States Court of Appeals, Ninth Circuit.

July 19, 1976.

David S. Teske, Federal Public Defender, Portland, Or. (argued), for appellant.

Kristine O. Rogers, Asst. U. S. Atty., Portland, Or. (argued), for appellee.

## OPINION

Before WRIGHT, KILKENNY and SNEED, Circuit Judges.

KILKENNY, Circuit Judge:

Appellant was convicted in a jury trial on two counts of an indictment charging violation of the Dyer Act, as a principal (18 U.S.C. § 2312), and as aider and abettor in the violation of the Act (18 U.S.C. § 2). His codefendant, Robert Jones, entered a plea of guilty to each count. Jones later testified as a witness on behalf of appellant. We affirm.

## BACKGROUND

Viewed in the light most favorable to the government, the record supports the following summary of facts.

During the first week in December, 1974, the appellant and Jones were in Boise, Idaho, where they spent several hours over a period of days at an automobile dealership, examining and test driving two 1974 Dodge vehicles. They told Aikens, a salesman, they were interested in a four-wheel drive vehicle and focused their attention upon a pickup and a van. On the evening of December 5th, the two men test drove the vehicles and returned them to the lot with full tanks of gas. The next morning, the vehicles were both missing and reported stolen.

Aikens remembers his contact with the two men, whom he had carefully observed, because he thought they were somewhat suspicious. He had observed them for well over an hour during which time he was "practically next to them." He had also called a taxi to take them from the lot to the place they were staying. Furthermore, Aikens was trained to closely observe faces of prospective buyers because he was interested in the commissions upon sales and wanted to be sure he would recognize the faces of customers with whom he had previously dealt when they returned to the dealership.

When the men first approached Aikens, they said they had flown in and had been looking at trucks on the lot the night before. They claimed to be in the export business, working in Arizona, and with an office in Medford, Oregon. When pressed toward talking turkey, the men told the salesman they had a partner in the South with whom they would have to confer before discussing price. To Aikens, it seemed they had come a very long distance to purchase vehicles needed in their business.

Some two days after the vehicles vanished, appellant and his codefendant, Jones drove up to a friend's house in Roseburg, Oregon, with the two vehicles. Appellant requested and received permission to leave the pickup truck on the property and both Jones and appellant drove off in the van. A few days later Jones was arrested driving the van, which contained appellant's suitcase, his prescription pill bottle and blank bills of sale, one of which was made out to indicate that Jones had sold the van to appellant for $5,500.00. Appellant's fingerprints were also discovered inside the van.

The following day, appellant was interviewed by special agents of the FBI in Roseburg. He told them he had been in Roseburg the preceding week and was seen by his wife and the proprietor of a local store. He told the agents that he had paid Jones $2,800.00 in cash for the van, but would not say where he had obtained the money. The next day, December 11, 1974, appellant was again interviewed by the agents and at this time admitted that he had lied to them the day before and that he was the person who arranged to have the pickup left at his friend's house.

On trial, appellant attempted to explain the previous discrepancies in his statements and testified that he was traveling in California and Nevada at the time of the theft. Codefendant Jones attempted to corroborate this story by testifying that he alone had transported the two vehicles to Oregon, towing one, and that appellant had not been with him in Boise. He also testified that he sold the van to appellant for $2,800.00, but casually wrote $5,500.00 on the bill of sale.

## ISSUES ON APPEAL

I. Did the failure of the Boise, Idaho, police department to conserve fifteen of the eighteen photographs shown to the witness Aikens deny appellant due process and effective assistance of counsel?

II. Were the comments by FBI agents and state police officers in the pretrial photographic displays unnecessarily suggestive, thus denying appellant's right to due process?

III. Did statements by government's counsel during the course of the trial shift the burden of proof to appellant and deny him due process and a fair trial?

## I.

Shortly after the arrest of appellant and Jones, the Oregon State Police forwarded to the Police Department of Boise, Idaho, three black and white photographs, one of which was the picture of appellant and two pictures of Jones. Upon receipt of these pictures, Richard Schuler of the Boise Police Department assembled a collection of eighteen black and white photographs of white, middle-aged men, including those of appellant and Jones. The fifteen other photographs were selected from the numerous pictures which were on file in the office of the Boise Police. The eighteen photographs were handed by Schuler to Aikens, the Dodge salesman who had the most contact with the suspects, and asked if the two men who had been looking at the pickup and the van the day before they disappeared from the lot were in the group. Schuler made no suggestions of any kind to Aikens. Without hesitation Aikens selected the picture of appellant and a picture of Jones as being the two persons with whom he had contact on the possible sale of the vehicles.

After the identification, Schuler retained all of the photographs for a period of several days. Then he received word that the case was probably going to be prosecuted in the federal courts, rather than in the Idaho state courts. Believing that the fifteen pictures from local files would not be of use in the federal prosecution, he

returned them to the Boise police files and was later unable to produce them for appellant's inspection.

Recognizing that counsel is not required at a photographic identification procedure, appellant takes a big step and argues that when it is not possible to reconstruct a photographic display, the situation is analogous to that about which concern was expressed in *United States v. Wade*, 388 U.S. 218, 231, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), in connection with the right to confrontation. Counsel attempts to read into the language of *United States v. Ash*, 413 U.S. 300, 315–316, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), a rule that when reconstruction is impossible there is denial of effective assistance of counsel. The language upon which appellant relies is related to the issue of confrontation, rather than to a failure to reproduce a photographic display. Far more pertinent to our problem is the language from *Ash*, which reads:

"Pretrial photographic identifications, however, are hardly unique in offering possibilities for the actions of the prosecutor unfairly to prejudice the accused. Evidence favorable to the accused may be withheld; testimony of witnesses may be manipulated; the results of laboratory tests may be contrived. In many ways the prosecutor, by accident or by design, may improperly subvert the trial. The primary safeguard against abuses of this kind is the ethical responsibility of the prosecutor, who, as so often has been said, may 'strike hard blows' but not 'foul ones.' . . . If that safeguard fails, review remains available under due process standards. . . . These same safeguards apply to misuse of photographs." *Id.* at 320, 93 S.Ct. at 2579.

Here is a proper place to emphasize that the fifteen photographs were never in the possession of the prosecutor, the FBI or any other United States government agency. The Boise police, under these facts, cannot be said to be acting on behalf of the federal government but rather on behalf of the State of Idaho. *Cf. United States v. Smith*, 433 F.2d 1266 (CA5 1970). Under such circumstances we should be reluctant to impute to the federal government the mistakes, particularly relatively innocent ones, committed by local police. Moreover, the demand to produce these photographs might well be likened to an attempt to require production under the Jencks Act of statements in the possession of state police. See *Beavers v. United States*, 351 F.2d 507 (CA9 1965), where the statements were never in possession of the United States and production was not required. By analogy, it is evident that the United States is in no way responsible for the actions of the Boise police in disposing of the fifteen photographs by inadvertence or otherwise. Appellant's reliance, by analogy, on *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), is unsound. In *Elkins*, there was a clear-cut violation by state officers of the defendant's immunity from unreasonable search and seizure, and the use of the seized evidence in defendant's conviction. Here, at most, is the act of a state officer innocently replacing in proper files a group of fifteen photographs, which he can no longer identify, under the belief that they would no longer be of use.

In the trial, Aikens positively identified appellant as the other man who was with Jones on the car lot in Boise the day before the theft and, on cross-examination, successfully resisted appellant's efforts to demonstrate that his in-court identification was based on the Oregon State Police photographs rather than on his clear-cut recollection of appellant's features observed during the one to two hour observation on the Boise car lot.

■ Assuming, *arguendo*, that the prosecution in some manner could be viewed as responsible for the loss of the now unavailable fifteen photographs, the following factors should be considered: (1) the degree of negligence or bad faith involved, (2) the importance of the lost evidence, and (3) the sufficiency of the other evidence adduced at the trial to sustain the conviction. *United States v. Bryant*, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971). In *Bryant*, the court felt that the testimony with reference to the

lost evidence was vague and indefinite and remanded the case to explore the negligence and bad faith involved. The same circuit in *United States v. Clemons*, 144 U.S.App.D.C. 235, 445 F.2d 711 (1971), *cert. denied* 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273, affirmed the convictions even though records of the pretrial photographic display had been lost. The court noted that each case must turn on its own facts. Here, as in *Clemons*, there were no irregularities in the identification procedures. As said in *United States v. Rojas*, 502 F.2d 1042, 1045 (CA5 1974), rejecting an argument that *Bryant* required a reversal, "There was other sufficient evidence to sustain the convictions. *Bryant* recognizes and supports such a good faith explanation." Here, as in *Bryant*, there was direct in-court identification by three witnesses, including Aikens.

On this issue, we conclude by saying that under the doctrine as stated in *Ash* the appellant's constitutional rights were preserved by allowing him to confront the witnesses Aikens and Schuler at the trial and to fully question them on the manner of preparation and presentation of the photographic spreads.

## II.

■ Before this court, the appellant argues: (1) that comments to witnesses that they had picked the right men were improperly suggestive, (2) that repeated showing of photographs to Aikens was highly prejudicial, and (3) that it was improper to use the photographs for identification in some instances because appellant was in custody.

The three eyewitnesses in this case were Aikens, Dutro and Canfield, all employees of the Dodge dealership in Boise during early December, 1974. Aikens was shown two sets of photographs, one by the Boise police and the other by the FBI. The latter display was about three months after the one by the Boise police. The other two eyewitnesses, Dutro and Canfield, were shown a photographic spread on only one occasion. Like Aikens, they made in-court identifications. Their testimony was based on their observations of appellant in Boise, rather than on any photograph or photographic display.

At the outset, we call attention to the finding of the trial judge on the motion to suppress the identification evidence. He found that the Boise detective and the FBI agent had "exhibited a fair method of identification, using the throw down, fair in all respects." There was no suggestion to any witness that he should pick any particular photograph.

At the close of the trial, the court submitted the identification issue to the jury in an elaborate instruction.[1] The law on the

---

1.

\* \* \* \* \* \*

"One of the most important issues in this case is the identification of the defendant as the perpetrator of the crime. The Government has the burden of proving identity, beyond a reasonable doubt. It is not essential that the witness himself be free from doubt as to the correctness of his statement. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.

Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later.

In appraising the identification testimony of the witness, you should consider the following:

One. Are you convinced that the witness had the capacity and an adequate opportunity to observe the offender?

Two. Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short a time was available, and how far or close the witness was, how good were lighting conditions, whether the witness had occasion to see or know the person in the past; are you satisfied that the identification made by the witness subsequent to the offense was the product of his own recollection. You may take into account both the strength of the identification, and the circumstances under which the identification was made.

*If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to him for identification, you should scrutinize the identification with great care.* You may also con-

subject, as articulated in *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), was properly applied to the facts by the district court. Under the totality of circumstances, as shown by the record, the procedure used in the pretrial identifications was not impermissibly suggestive. This is true whether we hold the district court's holding as one of law or as an issue of fact under the clearly erroneous rule.

On appellant's contention that the repeated showing of photographs to Aikens was highly prejudicial, we point out that he was shown only two sets of photographs, one by the Boise police and the other by the FBI. The latter display was about three months after the one in Boise. As with the previous issue, the totality of circumstances test as stated in *Simmons* would be applicable. *See also Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). While the repeated showing to a witness of photographic displays for the purpose of identification presents opportunities for abuse and due process problems, when it is shown that the witness was equivocal on the first selection and became firm on a latter showing, that rule should not be applied where the witness has been consistently firm. In this instance, the procedure could not be prejudicial to appellant. In this respect, the record before us is similar to that in *United States v. Eatherton*, 519 F.2d 603 (CA1 1975), *cert. denied* 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304. We think it was not only legitimate, but also a sound pretrial caution for the prosecution to again interrogate Aikens before the trial. For that matter, counsel for the government might well be accused of incompetence if they had failed to follow through on this universally accepted pretrial technique, especially where the first identification was conducted by another agency. It is well settled that even after arrest, the government may use photographic identification if the procedure is one which fully protects the rights of the accused. *United States v. Fowler*, 439 F.2d 133, 134 (CA9 1971).

The mere suggestion that the accused committed the crime does not constitute a due process violation. To the contrary, in order to make out a constitutional violation the suggestion must be so "unnecessary" or "impermissible" as to create a "substantial likelihood of irreparable misidentification" based upon the "totality of the circumstances." *Neil v. Biggers*, 409 U.S. 188, 197–199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *United States v. Sambrano*, 505 F.2d 284, 286 (CA9 1974).

Even the use of an identification procedure, utilizing a single photograph, does not necessarily interject prejudice with respect to whether pretrial identification procedure necessarily affected trial identification. *United States v. Baxter*, 492 F.2d 150, 151, 172 (CA9 1973), *cert. denied* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). In circumstances such as these, the evaluation of the probative value of each of the witness' identification testimony is an issue for the jury. *United States v. Valdivia*, 492 F.2d 199, at 210. We conclude that in these circumstances the verdict of the jury on these issues is binding on appellant.

### III.

Under this issue, appellant first argues that certain statements by government counsel in the opening argument and during the course of the trial, shifted the burden of proof to appellant. He argues that from the outset the government wrongfully and deliberately cast upon him the burden of proof. He seizes upon the prosecutor's language in the opening statement that the only conclusion that could be reached by the Boise owners was that the vehicles had been stolen, the same assumption being made early in the prosecutor's examination of one of the witnesses. Objection was made to each of the statements

---

sider the length of time that lapsed between the occurrence of the crime and the next opportunity of the witness to see defendant, as a factor bearing on the reliability of the identification."

\*   \*   \*   \*   \*   \*

[Emphasis supplied.]

and promptly sustained by the court. That error, if any, was harmless.

Appellant took the witness stand and presented an alibi by offering testimony that he was not in Boise, but at the time of the theft was in Sparks, Nevada, on the day that the vehicles had been stolen, after having missed contact with friends in Redding, California. As part of his alibi, he presented evidence of a telephone call from Sparks to a number in Roseburg, Oregon. That fact alone would not establish that appellant was not in Boise the evening before the call. The distance between Boise and Sparks, approximately 420 miles, is such that it could be driven in eight hours, or less. He also attempted to explain why, upon interrogation by an FBI agent, December 10, 1974, he had indicated his wife had seen him in Oregon during the time the crime was committed in Boise. During the course of the cross-examination, the prosecutor asked appellant if he could come up with the name of anyone who saw him in California or in Nevada during the three days he was absent. The objection to this statement was sustained by the court. During the closing argument, the prosecutor inferred that appellant had failed to use his subpoena powers to call alibi witnesses, had a difficult time in explaining why his suitcase was in the van, and had failed to call his wife to the witness stand in support of the alibi.

At the outset, appellant is faced with his decision to take the witness stand. It is uniformly held that once a defendant takes the stand and testifies in his own behalf, his credibility may be impeached and his testimony assailed like that of any other witness and the breadth of his waiver is determined by the scope of the relevant cross-examination. *Brown v. United States*, 356 U.S. 148, 154–156, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). Such a defendant has the choice to weigh the advantage of placing before the jury his version of the facts and his reliability as a witness or not to testify at all. It is not a reasonable argument to say that the Fifth Amendment gives such a defendant not only the choice, but also an immunity to cross-examination on the matters he himself puts in dispute by his testimony. The extent of the cross-examination of a defendant is a matter within the discretion of the court. *United States v. Palmer*, 536 F.2d 1278 (CA9, 1976); *Lewis v. United States*, 373 F.2d 576, 578 (CA9 1967). When the defendant claims an alibi, the discretion of the trial court is very broad. *Lewis, supra* at 578; *United States v. Johnson*, 285 F.2d 35, 40 (CA9 1960). Adhering to the same rule is *Melendrez-Rodriquez v. United States*, 441 F.2d 1109, 1110 (CA9 1971).

Moreover, once appellant adopted an alibi defense, he was confronted with the provisions of new Rule 12.1, F.R.Crim.P., Notice of Alibi. The rule provides, among other things, that after proper notice by the government, defendant ". . . shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and *the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.*" Needless to say, the rule does not change the burden of proof. The burden of proof to establish guilt beyond a reasonable doubt remains with the government. However, a defendant when intending to rely on an alibi is under an obligation to provide certain information to the government and is under a continuing duty to disclose the names and addresses of witnesses upon whom he relies to establish his alibi. This rule became effective on July 31, 1975, some three weeks prior to appellant's trial. Doubts about the general constitutionality of a notice of alibi rule were, in general, resolved by *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), and *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). In *Wardius*, however, the Supreme Court held that the Oregon alibi statute was unconstitutional for the reason that the Oregon statute did not give a defendant an opportunity to discover the state's rebuttal witnesses.

The fallacy of the appellant's argument on this issue is demonstrated by the rights of the government in case we were to re-

verse and remand for a new trial. In that event, beyond question, the government could invoke the provisions of Rule 12.1 and require appellant to ". . . state the specific place or places at which the defendant [appellant] claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi."

■ Even if appellant had not taken the witness stand, the comment by the prosecutor which merely drew the jury's attention to the appellant's failure to present alibi witnesses would have been fair comment on the weakness of the defense and was not a violation of appellant's right to remain silent. *United States v. McClain*, 469 F.2d 68, 70 (CA3 1972); *United States v. Keller*, 512 F.2d 182, 186 (CA3 1975). The prosecutor's statements in the record before us cannot be construed as comments on the failure of appellant to testify. *Keller, supra* at 186; *United States v. Kenny*, 462 F.2d 1205, 1228 (CA3 1972), *cert. denied* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176.

That the court did not switch the burden of proof to the appellant is made manifest by its instructions to the members of the jury reminding them, time and time again, that the burden of proving the defendant guilty beyond a reasonable doubt was always on the government. In these circumstances, we find nothing improper in the statements or arguments of counsel.

■ Finally, the appellant argues that the court erred in giving the customary instruction concerning inferences that the jury might draw from appellant's possession of recently stolen property. As part and parcel of the instruction, the court cautioned the jury that "If any possession the defendant may have had of recently-stolen property is consistent with innocence, or if you entertain reasonable doubt of guilt, you must acquit the defendant." And further cautioned them to: ". . . bear in mind that the defendant in this case need not prove anything since the burden of proof always rests on the government to prove the defendant guilty beyond a reasonable doubt." The challenged instruction has

been approved by our court on countless occasions, including *United States v. Tocki*, 469 F.2d 655, 656–657 (CA9 1972); *United States v. Gardner*, 454 F.2d 534, 536–537 (CA9 1972), *cert. denied* 409 U.S. 867, 93 S.Ct. 164, 34 L.Ed.2d 116; *United States v. Redd*, 438 F.2d 335 (CA9 1971), *cert. denied* 402 U.S. 977, 91 S.Ct. 1681, 29 L.Ed.2d 143 (1962).

## CONCLUSION

Viewing the record as a whole, we have no doubt that appellant had a fair trial and that the judgment of conviction should be affirmed.

IT IS SO ORDERED.