**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James R. BROWN and Carol Herklotz,
Defendants-Appellants.**

**Nos. 81–1757, 81–1758.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 16, 1982.
Decided Sept. 8, 1982.

Charles W. Giesen, Eisenberg, Giesen, Ewers & Hayes, Madison, Wis., for respondent-appellant.

Judith M. Hawley, Asst. U. S. Atty., Madison, Wis., for plaintiff-appellee.

Before PELL, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and BAUER, Circuit Judge.

BAUER, Circuit Judge.

Carol Herklotz and James R. Brown were charged with violating 18 U.S.C. § 665 by conspiring to embezzle and misapply property belonging to an employment training program funded under the Comprehensive Employment and Training Act of 1973 (CETA), 29 U.S.C. § 801 *et seq.* The eight count indictment also charged each defendant with one count of embezzlement and misapplication of government property and three counts of causing a false material statement to be made in a matter within the jurisdiction of an agency of the United States, in violation of 18 U.S.C. §§ 2, 1001.

The case was tried to a jury. The evidence at trial showed that James Brown and Carol Herklotz worked for the Western Dairyland Supported Work Program (Program), a program designed to teach ex-offenders, recovering alcoholics and welfare recipients marketable job skills. Brown was hired as Program Director. After his appointment, he hired Herklotz as Personnel Coordinator.

Trainees in the Program received salaries and fringe benefits from CETA funds obtained through contracts between the Department of Labor and the Wisconsin Department of Industry, Labor and Human Relations (State Agency) and between the State Agency and the Program. The federal government funded other Program costs with non-CETA funds. These funds were made available through contracts between the Department of Labor and the Manpower Demonstration Research Corporation (Manpower), a private non-profit corporation which manages federally funded social programs, and between Manpower and the Program.

Documentation of all Program costs was required. The evidence showed that Brown and Herklotz improperly diverted resources and services paid for by CETA funds for their own use. They assigned Program trainees to perform tasks benefitting Cataract Corporation, a private corporation of which Brown was president and sole stockholder, and Herklotz was secretary-treasurer. They also used the Program's vehicles, office personnel and stationery supplies to conduct Cataract business. In an attempt to hide these facts they falsified, or had others falsify, time cards and time sheets.

The jury found each defendant guilty on all charges. Thereafter defendants renewed their motion to dismiss or consolidate Counts III, IV and V and Counts VI, VII and VIII which they had made prior to and during trial, alleging that these counts were multiplicitous. The district court granted the motion and ordered the government to dismiss two of the three counts. The government dismissed Counts IV and V and Counts VII and VIII.

Brown and Herklotz raise numerous issues on appeal. First, they claim that the admission of certain business documents and "bad acts" evidence and the government's violation of the court's order barring certain testimony was harmful error. Appellants also contend that their constitutional right to a fair trial was violated because the trial judge and the prosecutor improperly commented on Brown's silence and because the court restricted the scope of defense counsel's closing arguments. Further, they claim that the court's denial of the motion to dismiss or consolidate the falsification counts was unduly prejudicial because: (1) these counts should have been dismissed for failure to satisfy the materiality test; and (2) submission of multiplicitous counts to the jury exaggerated the extent of their alleged criminality. Finally, they challenge the jury instructions on the elements necessary to support a conviction under 18 U.S.C. § 1001. For the reasons discussed below, we affirm.

## I

Appellants claim that the district court's evidentiary rulings on the admission of Cataract's business records and other "bad acts" evidence deprived them of a fair trial. Since the trial court has broad discretion to assess the admissibility of proffered evidence, we may reverse these rulings only upon a clear showing of abuse of discretion. *United States v. West*, 670 F.2d 675 (7th Cir. 1982). Appellants have failed to make this showing.

### A

The business records admitted into evidence were initially produced before the grand jury. Brown had been subpoenaed to appear and produce Cataract's records. However, instead of appearing, Brown informally negotiated an agreement with the government whereby Brown's attorney would produce the documents but Brown would not appear. After his indictment, Brown maintained that these records were inadmissible at trial because a proper foundation had not been laid. At the pretrial

hearing Brown, claiming fifth amendment privilege, refused to authenticate these records. The trial judge ruled that Brown's refusal to identify the records was not a proper claim of privilege against self-incrimination, tr. at 54, and ordered him to respond. When he refused, he was held in contempt. The records were then identified by two government witnesses, an Assistant United States Attorney and an FBI Special Agent. They testified that Brown's attorney delivered Cataract's records to them, representing that he was Brown's agent and that the records he was delivering were the Cataract documents which had been subpoenaed. Tr. at 93–95, 104. The documents were admitted into evidence on the basis of this testimony.

Brown maintains that identification by the government witnesses was not proper authentication. He concedes that the documents were produced in lieu of compliance with a subpoena, but argues that, at the time of production, his attorney did not make any representations as to their authenticity. Moreover, he alleges that his counsel could not have authenticated these documents because he had no association with Cataract and, thus, lacked any knowledge regarding their authenticity.

■ Brown's argument is totally without merit. First, we do not agree with Brown that producing the records pursuant to an agreement with the government after being served with a subpoena is significantly different from responding to the subpoena itself. Even Brown admits that if he had produced the documents personally in response to the subpoena, the very act of producing them and representing them to be the documents described in the subpoena would have authenticated them. Tr. at 55. The mere fact that Brown was able to negotiate with the government to agree to produce the records without going before the grand jury does not give him the right, several months after production, to assert

that the documents he voluntarily produced were not the ones he represented them to be. Brown cannot have it both ways. Once he voluntarily produced the documents and implicitly represented them to be Cataract's records, he cannot be heard to contend that they are not Cataract's records.

Federal Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Brown produced the documents voluntarily and, as an officer of the corporation, he was in a position to vouch for their authenticity. Just as he could have identified the records by oral testimony, his very act of production was implicit authentication.[1] Moreover, Brown's counsel, who was clearly acting as the agent of Cataract's president when he produced the documents, concedes that the documents "originate[d] somewhere in some connection with the corporation." Tr. at 48. There is ample evidence that the documents were Cataract's records.

■ Finally, there is no merit to Brown's claim that admission of Cataract's documents after Brown's implicit authentication impinged on Brown's constitutional privilege against self-incrimination. Authentication relates only to whether the documents originated from Cataract; it is not synonymous to vouching for the accuracy of the information contained in those records. The records were properly admitted.

**B**

Appellants contend that the introduction of "bad acts" evidence constituted reversible error because its "marginal probative value" was "far outweighed by both its prejudicial effects and its tendency to shift the focus of the trial from the substantive offenses to ... collateral and trivial inci-

---

1. Brown's reliance on *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), to support his contention that there can be no implicit authentication is misplaced. There the issue was whether an attorney could be subpoenaed to produce his client's documents over claims that the documents were privileged in the client's hands and, thus, also privileged in his attorney's hands. This case has nothing to do with authentication.

dents." Appellants' br. at 47. The challenged evidence established that: (1) James Herklotz, husband of defendant Herklotz, did electrical work for the Program and submitted an excessive bill under the name S and S Electric; (2) James Brown used the Program's stamps for personal business; (3) James Brown used the Program's secretarial services and supplies for personal letters; (4) defendant Herklotz padded her lunch expense voucher; (5) James Brown encouraged another Program employee to double bill his gas expenses.

▇ The trial judge, who saw and heard the evidence firsthand, can best balance probity and prejudice, and the reviewing court may reverse only upon a showing of abuse of discretion. *United States v. Watson*, 623 F.2d 1198 (7th Cir. 1980). In reviewing the admissibility of relevant, potentially prejudicial evidence, we view the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing the prejudicial effect. *United States v. Brady*, 595 F.2d 359 (6th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979).

▇ Contrary to appellants' assertions that the trial judge permitted the wholesale admission of collateral evidence without "any thorough appraisal of the prejudicial effect," [2] appellants' br. at 48, the record shows that each piece of proffered evidence was carefully analyzed and admitted only when it was found to be relevant. Tr. at 271–79. For example, evidence relating to the improper electrical bill was admitted while evidence relating to whether Brown appropriated postage stamps for his personal use was not.[3]

We also agree with the government that the evidence relating to whether appellants improperly used the Program's secretarial services and stationery was not collateral but directly related to the charge in the indictment that Brown and Herklotz conspired to use the Program's employees and property to promote their private business. There was no error with respect to any of these evidentiary rulings.

## II

We next consider whether the appellants were denied their constitutional right to a fair trial by the prosecutor's and the court's comments alluding to Brown's silence, by the alleged violation of the court's order barring testimony relating to defendants' firing, and by the court's limitation on the scope of defense counsel's closing argument.

## A

Brown contends that four comments made in the course of the thirteen day trial regarding his failure to present evidence resulted in constitutional error. The challenged comments were: (1) the court's statement, in response to defense counsel's request that the government be ordered to recall a witness, that defense counsel could subpoena the witness; (2) the court's statement, in response to defense counsel's attempt to introduce documents during the cross-examination of a government witness, that defense counsel could "attempt to introduce them at the time of [his] case." Tr. at 729–A; (3) the court's statement, at the end of the government's case-in-chief, that Herklotz would present her case first; and (4) the prosecutor's remark, during closing argument, about the lack of any evidence that Brown conducted interviews before choosing James Herklotz as a Program consultant.

▇ It is beyond dispute that any reference to the defendant's failure to testify or present evidence is highly disfavored: Remarks which are manifestly intended to

---

**2.** Assuming *arguendo* that the trial judge failed to specifically state the reasons for ruling in favor of admission, this omission does not constitute reversible error unless it can be shown that substantial rights of the defendants have been violated. *United States v. De John*, 638 F.2d 1048 (7th Cir. 1981).

**3.** Although there was an attempt by the government to introduce this evidence, the testimony was struck and the jury instructed to ignore it. Tr. at 1459-60.

be, or are of such character that the jury would naturally and necessarily take them to be, comments on defendant's silence constitute reversible error. *United States v. Muscarella*, 585 F.2d 242 (7th Cir. 1978). Despite the constitutional prohibition against commenting on defendant's failure to present evidence, such comments do not automatically compel reversal, for statements which, when considered in isolation, might seem prejudicial may be harmless error when examined in context. *United States v. Forrest*, 620 F.2d 446 (5th Cir. 1980), *appeal after remand*, 649 F.2d 355 (5th Cir. 1981).

■ Applying these principles to the facts here, we conclude that Brown suffered no constitutional violation for several reasons. First, each of the challenged court comments were related to the fact that the two defendants adopted different defense strategies. Herklotz made an opening statement and called two witnesses; Brown offered no evidence. The court's comments were prompted by its efforts to administer the trial in an orderly manner and to advise the jury as to how the trial would proceed. Further, none of these statements referred specifically to the defendant's own failure to testify. At most, these comments suggested that there was no evidence to support the defense. *United States v. Bright*, 630 F.2d 804, 826–28 (5th Cir. 1980). Also, any implication that Brown should have presented evidence was cured by the repeated cautionary instructions reminding the jury that a defendant has no such obligation. Tr. at 739, 1947–48.

Similarly, the prosecutor's remark was not harmful error. The prosecutor had just begun to argue that "there isn't any testimony that Mr. Brown conducted any interviews or received any . . .," Tr. at 2203, when she was interrupted by defense counsel's objection. This objection was sustained. Thus, the fleeting reference to the lack of evidence was never completed. There has been no showing that the jury construed this remark as a comment on Brown's silence. *United States v. Jones*, 648 F.2d 215 (5th Cir. 1981). In view of the facts that the comment was never completed, that the jury may never have construed the indirect allusion as a comment on Brown's silence and that the objection was sustained, the statement was harmless error. *United States v. Higginbotham*, 539 F.2d 17 (9th Cir. 1976).

B

Appellants contend that violation of the court order barring testimony relating to their firing from the Program also denied them a fair trial. They cite two instances in which they claim the court order was violated. The first incident occurred during the direct examination of government witness Schlimm. He was asked when he had been acquainted with Brown. He responded, "From the time he was hired . . . to the time he was suspended . . . ." (Tr. at 408–09). The second incident occurred on redirect examination of government witness Conti, after defense counsel had questioned Conti about a conversation he had had with Brown in which Brown stated that he had been fired. On redirect the prosecutor asked why Brown had been fired.

■ Appellants contend that the government purposely violated the court order. Alternatively, they argue that the government was at least partly responsible for Schlimm's gratuitous statement because the government had a duty to make the witnesses aware of the proper limits of their testimony. Neither argument is sound. There is nothing in the record to establish that the government purposely violated the court order nor did the trial court make such a finding. Moreover, the prosecutor's questioning of Schlimm was not leading and Schlimm's response was spontaneous and inadvertent. Additionally, we note that while appellants chastise the government for questioning Conti about Brown's firing, this topic was initially brought out by defense counsel during cross-examination. Once defense counsel broached the subject, the government was certainly entitled to pursue the topic on redirect. Neither of the challenged statements mandate reversal.

### C

The district court ruled that the value of the trainee services misapplied was the amount paid to the Program's trainees in salary and fringe benefits. Appellants wanted to argue that the value of these services was only the right to the benefit of the services, not the value the trainees received for the services. Appellants concede that some trainees spent time making tripod legs for Cataract, which Cataract sold to Grampa's Workshop, Inc. But they emphasize that these trainees were unskilled workers who destroyed machinery, wasted material, and produced inferior products which did not meet specifications. They contend that use of trainees in the tripod leg-making operation was a detriment rather than a benefit to Cataract. Appellants maintain that the court's refusal to permit them to suggest in closing argument that the value of the services misapplied was anything other than the amount paid to the trainees for Program participation denied them their right to argue facts in evidence and prevented them from arguing that they were guilty, at most, of a misdemeanor, but not a felony.[4]

██ *United States v. Coleman*, 590 F.2d 228 (7th Cir. 1978), *cert. denied*, 440 U.S. 980, 99 S.Ct. 1786, 60 L.Ed.2d 239 (1979), the only case cited by appellants in support of their bizarre theory of value, actually undermines the theory. In *Coleman* the defendant attempted to argue that services of persons compensated out of grant money did not constitute property and, therefore, misappropriation of such services is not theft, embezzlement or willful misapplication of property under 18 U.S.C. § 665. The *Coleman* court rejected this reasoning and held that the services of trainees contemplated by the granted funds were property which was the subject of a CETA grant and, thus, within the purview of

§ 665. While not directly addressing the question of the value of the misappropriated services, this holding certainly suggests that the value is the amount of CETA funds expended on those services.

The evidence clearly shows that the trainees spent long hours constructing tripod legs which Cataract sold for its own benefit. Yet, appellants are attempting to argue that having appropriated trainee services costing the government $1,500, they did not get services worth that much because the work was of poor quality. This argument borders on the frivolous. The quality of the services misappropriates is irrelevant. The fact remains that appellants misappropriated services costing the government over $1,500. That sum is the value of the services.

Defendants successfully objected to the admission of government evidence relating to the extent that free trainee services benefitted Cataract. Tr. at 812. Having so objected, they cannot now be heard to complain because the trial court similarly prevented them from arguing the value of these services in closing argument.[5]

### IV

Finally, appellants claim that Counts III through VIII of the indictment should have been dismissed because the acts described in these counts do not constitute false written statements of material fact in matters within the jurisdiction of a United States agency, and, thus, do not sufficiently allege any violation under 18 U.S.C. § 1001. Alternatively, appellants argue that the trial court committed reversible error by waiting until after the jury had returned a verdict to grant their motion to consolidate the three falsification counts against each appellant. These arguments are unavailing.

---

4. Under 18 U.S.C. § 665, conviction for misapplication of CETA funds carries a maximum fine of $10,000 or two years imprisonment, or both, unless the amount misapplied is under $100, in which case the maximum punishment is a one year prison sentence or a $1000 fine or both.

5. Appellants also challenge two instructions on the elements of the offenses charged. These claims are duplicative of other claims already discussed in this opinion and found to be without merit. The challenged instructions were not error.

## A

Counts III, IV and V allege that Herklotz caused Tim Johnson to enter an incorrect code on the time sheets of three trainees. Similarly, Counts VI, VII, and VIII allege that Brown caused Gerald McDonald to enter an incorrect code on the time cards of three other trainees. Subsequently, Counts III, IV, and V were consolidated into one count and Counts VI, VII, and VIII were consolidated into one count.

The first consideration is whether falsifying codes on time sheets and time cards is a false written statement of material fact. The time sheets were the means whereby the Program reported to Manpower, the corporation administering the funds, how the funds were being spent. The time sheets were filled out from information recorded on the time cards. A code indicated the trainee's worksite location. By falsifying the worksite location code, the time cards and time sheets indicated that the trainees were working at a forestry worksite when they were actually engaged in tasks relating to the manufacturing of tripod legs that Cataract sold at a profit.

Appellants do not dispute that the codes were inaccurate. Instead they defend on the basis that, although the charge codes were part of the information used to generate aggregate reports on the Program's progress, this data was not relied upon by any of the participating agencies in making financial or administrative decisions affecting the Program. Appellants argue that falsifying codes on the trainee's time cards and time sheets had no effect on any agency determination. They assert that the time cards, which were optional documents merely reflecting the days and hours of each trainee's participation in the Program, provided some of the data which was transferred to the computer cards. They emphasize that the computer cards, not the time cards, initiated the payroll processing. Because the worksite location was not transferred to the computer cards and the information on the time cards was not transferred to the time sheets until after the computer cards had been sent to the bank,

appellants argue that the incorrect codes had no effect on the payroll process.

Appellants misunderstand the relevance of falsifying the worksite location codes. Trainees were entitled to the CETA funds only for the days and hours during which they were engaged in authorized Program activities. Their time cards and time sheets were designed to reflect the extent of their Program participation. Thus, any time reflected on the time cards and time sheets which indicated that the trainees were working for the Program when they were actually working for Cataract is a false statement of a material fact concealing that federal funds were being used to pay for unauthorized work.

We agree with the government that the false statements on the time cards and time sheets were material because the information on them initiated other records which, in turn, had the ultimate effect of paying trainees for performing unauthorized work for Cataract while preventing Manpower, the State Agency and the Department of Labor from accurately monitoring federal funds.

## B

Appellants claim that the denial of their motion to consolidate Counts III to VIII caused a multiplicitous indictment to go to the jury and exaggerated the extent of their alleged criminality.

An indictment is multiplicitous if it charges the same offense in several separate counts. *United States v. Berardi*, 629 F.2d 723 (2d Cir.), *cert. denied*, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). Determination of whether the misappropriation of CETA funds constitutes one or many offenses turns on the factual circumstances of each case. *United States v. Billingslea*, 603 F.2d 515 (5th Cir. 1979).

Where, as here, the misappropriation involved an elaborate scheme, the trial court was justified in denying the motion until all the evidence was presented. *Id.* Moreover, *United States v. Reed*, 639 F.2d 896 (2d Cir. 1981), mistakenly relied upon by

appellants, makes clear that the principal danger of a multiplicitous indictment is that the defendant will be given multiple sentences for the same offense. This danger can be remedied *at any time by merging the convictions* and permitting only a single sentence. *Id.* at 904 n.6 (emphasis added).

■ Brown was sentenced to sixty days in jail, fined $5,000, placed on probation for two years and ordered to pay $1,000 restitution to the Program. Herklotz was sentenced to twenty days in jail, placed on probation for two years and ordered to pay $598 restitution. Any prejudice to appellants by allowing the multiplicitous indictment to go to the jury did not result in multiple sentences, and, in view of the overwhelming evidence of appellants' guilt, the prejudice to them, if any, is clearly not reversible error.

Accordingly, the judgment of the trial court is

AFFIRMED.

FAIRCHILD, Senior Circuit Judge, concurring.

Defendants wished to argue to the jury that the *government had not proved that* the services misapplied had value. They contend that because CETA was a training program and the payments were "more of a welfare-type payment," the payments to a particular worker did not reflect the value of the worker's services. The court did not permit this argument to be made, noting that the administrators of the program had determined that the services of each worker were worth a particular rate of pay.

I do not go so far as to say that there could be no set of facts in which a similar argument would have validity. Nevertheless, the undoubted purpose of the statute is to protect the assets and funds granted under the Act. Considering that purpose, and the evidence in this case, it seems to me that it was correct to rule that the value of the services misapplied was established by the wages and benefits. Those were the amount of program funds required to generate the services misapplied.