**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Charles W. LAWRENCE, Jr., Joseph A. Bertucci, and Norah S. Bertucci, Defendants–Appellants.**

**Nos. 90–1614, 90–1630.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1990.

Decided June 10, 1991.

---

Nathan A. Fishbach, Deputy U.S. Atty., Office of the U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Thomas E. Brown, Marna M. Tess–Mattner, Gimbel, Reilly, Guerin & Brown; and Terry E. Mitchell and Paul N. Brandau, Mitchell, Baxter & Zieger, Milwaukee, Wis., for defendants-appellants.

Before BAUER, Chief Judge, CUMMINGS and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

This is an appeal from a criminal tax prosecution of three business partners, Joseph and Norah Bertucci, who are husband and wife, and Charles W. Lawrence, Jr. (collectively, "Defendants"). The three owned and operated two bookstores in Wisconsin: Paradise Books in Milwaukee, and Popular News (LOK, Inc.) in Oshkosh. The bookstores sold "adult oriented" books, magazines, films, and other products. The stores also operated video arcades featuring sexually explicit films. Whenever a customer purchased merchandise over the counter, the sales clerks carefully noted the type and quantity of the product on a daily sales sheet and rang up the sale on a cash register. Video arcade sales were handled differently. Clerks kept bags of 200 tokens worth fifty dollars at the counter. In order to enter the arcade area, a customer was required to purchase a minimum of two dollars' worth of tokens for use in a private viewing booth. When a clerk sold a bag of tokens, he would take the fifty dollars generated from the sale, band it, and place it in the safe. Video arcade token sales were not rung up

on the cash register like merchandise sales, and the daily sales sheet did not contain spaces to keep track of token sales. The video booth coin boxes were emptied once or twice per week. Tokens and coins removed from booth boxes (the boxes accepted both tokens and coins) were identified on bank deposit slips as arcade sales.

The government theorized that Defendants were skimming off a portion of the receipts from the sale of tokens to avoid paying federal taxes on the undisclosed amounts and that they "washed" the skimmed money by concocting phony loans from stockholders and from Norah Bertucci's sister, Morel Fry. In January 1986, Steven J. Facik and John R. Schlicht, Special Agents with the Internal Revenue Service ("IRS") Criminal Investigation Division, visited Popular News and informed the Bertuccis that their 1982, 1983, and 1984 personal income tax returns were under investigation. Fifteen minutes into the interview, Lawrence showed up, and the agents questioned all three Defendants together. They were asked about the source of the income generated by their partnership, L & B Enterprises, and also about their purchases of real estate, stock, a boat, and other items. The agents also asked Defendants if they had deposited all the receipts generated by the token sales into the bookstores' corporate bank accounts, and if these undeposited amounts were reported on their tax returns.

As a result of information garnered during the investigation, the case went to a federal grand jury in Milwaukee. On March 7, 1989, the grand jury returned an indictment against Defendants charging them with conspiracy to impede the IRS in violation of 18 U.S.C. § 371, plus twenty-four other substantive tax charges. After a jury trial, Defendants were found guilty of the conspiracy charge. Additionally, Joseph Bertucci and Lawrence were convicted of filing false corporate income tax returns for Paradise Books and LOK, Inc., in violation of 26 U.S.C. § 7206(1), and aiding and assisting in the preparation of false corporate tax returns for fiscal years 1982 through 1984, in violation of 26 U.S.C. § 7206(2). Norah Bertucci was convicted

of filing false corporate tax returns for Paradise Books for fiscal years 1982 through 1984 and one count of aiding or assisting in the preparation of a false corporate tax return for LOK, Inc. for 1984. Defendants were acquitted on all charges arising out of their personal and partnership tax returns for 1982 through 1984, and Norah Bertucci also was acquitted on two counts for the corporate returns for LOK, Inc. for the years 1982 and 1983. All three received prison terms, probation, and fines. This appeal followed.

Defendants raise several contentions with regard to the daily sales sheets from Paradise Books and Popular News, compiled during the period between July 31, 1983, to April 7, 1984. On many of the sheets, there appeared two handwritten numbers, one at the top right hand corner, and one at the bottom right hand corner. The government used these sheets to bolster its skimming theory by hypothesizing that the top number represented the number of bags of tokens available at the beginning of the day, and the bottom number represented the number left at day's end. The difference between these amounts represented the value of the tokens sold during the day. According to the government, because some weekly bank deposits were less than the amounts that should have come in using this method, Defendants must have been skimming off a portion of the token sales for their personal use.

Defendants argue that the trial court abused its discretion by admitting the sheets into evidence without requiring that they be properly authenticated as business records under Federal Rule of Evidence 803(6). In order for evidence to fall under the business record exception to the hearsay rule, the government must lay a proper foundation establishing that the documents produced were records kept in the course of regularly-conducted activity and that "it was the regular practice of that business to make [the document] as shown by the testimony of the custodian or other qualified witness." Fed.R.Evid. 803(6). The business records exception to the hearsay rule "does not require that the witness have

personal knowledge of the entries in the records. The witness need only have knowledge under which the records were created." *United States v. Wables,* 731 F.2d 440, 449 (7th Cir.1984).

In a pretrial motion, the government argued that the bookstores' records (including the daily sales sheets) were authenticated adequately because Defendants admitted to the investigating agents that the bookstores made and kept the records in connection with their corporations, and because Defendants' attorney produced the records in response to the government's summonses and subpoenas. The district court rejected Defendants' contention that the documents can be authenticated only by a witness who is an employee or agent of the organization familiar with the organization's practices and procedures. Pronouncing our decision in *United States v. Brown,* 688 F.2d 1112 (7th Cir.1982) (Bauer, J.), "controlling," the court held that "once a defendant voluntarily produces documents and implicitly represents them to be the subpoenaed corporate records, he cannot be heard to contend that they are not so." *United States v. Bertucci,* (E.D.Wis.1989).

In *Brown,* the defendant had been subpoenaed to appear before a grand jury with company records pertinent to his indictment for embezzlement of federal funds. The defendant negotiated an agreement whereby his attorney would produce the documents without the defendant having to appear. At a pretrial hearing, the defendant refused to authenticate the records and was held in contempt of court. The records then were identified by an Assistant United States Attorney and an FBI Special Agent. Both testified that the defendant's attorney delivered the records to them, representing that he was the defendant's agent, and that the records he was delivering were the records that had been subpoenaed. The court admitted the records on the basis of this testimony. On appeal, the defendant maintained that identification by the government witnesses was not proper authentication. We held that once the defendant voluntarily produced the records and implicitly represented them

to be the company records, he could not later complain that the documents did not originate from the company. Further, Federal Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." The defendant was an officer of the company, and produced the documents voluntarily. He thus was in a position to vouch for their authenticity, and his "very act of production was implicit authentication." *Brown,* 688 F.2d at 1115–16.

With *Brown*'s principles in mind, we conclude that the trial court did not abuse its discretion in admitting the daily sales sheets as properly authenticated business records. The subpoenaed documents were delivered by Defendants' attorney and they were identified by the government witnesses. Other factors lend reliability to the documents as well. Defendants admitted to Special Agent Facik during the investigation that they kept various records, including daily sales sheets, as part of their method of operation. In addition, the collective testimony of several of Defendants' employees—testimony of custodians or otherwise qualified witnesses who can explain the recordkeeping of the organization—established the regular practices and procedures under which the records were created, the very elements necessary for a finding of trustworthiness. Michael Traudt, Robert Frank, Steven Bong, and Thomas Martin, clerks from Defendants' stores, and Raymond Manis, a manager of Popular News, testified that numbers were placed at the top and bottom right hand corners of the daily sales sheets, indicating the number of bags of tokens that were available at the beginning and end of each day. Manis instituted a system to give Joseph Bertucci a daily count of sales. He testified that he used the daily sales sheets to prepare a deposit ticket for the receipts from the weekly token sales. He also provided the daily sales sheets and deposit tickets to either Joseph Bertucci or Lawrence. Frank testified that he discussed

the daily sales sheets with Joseph Bertucci and that he gave them to Bertucci at the end of his shift. Bong related that Joseph Bertucci told him to place the notations on the daily sales sheets, and Martin indicated that he saw all three Defendants emptying the safe where the receipts from token sales were kept and comparing the receipts in the safe against the notation on the upper right hand corner of the daily sales sheets.

This testimony, together with Defendants' own statements to government investigators that they kept these records in connection with their businesses and the production of those records by their attorney in response to a government subpoena, leads us to conclude that the trial court properly admitted the daily sales sheets into evidence as properly authenticated business records. Defendants contend that the "sources of information and the documents themselves indicate such a complete absence of trustworthiness that any apparent authentication under Rule 803(6) is invalid." Defendant's Brief at 28–29. Defendants point out that none of the clerks really knew if there was a standard procedure for recording token sales or how it worked. Defendants also suggest that the daily sales sheets themselves were untrustworthy because many bore missing or incomplete numbers in the top and bottom corners. The evidence is to the contrary. Several of Defendants' employees testified in some detail concerning the practice of making notations on the right hand corners of the daily sales sheets indicating token sales. Moreover, Special Agent Facik analyzed 783 daily sales sheets, and only 33 failed to contain these notations on the top and bottom right hand corners.

■■■ Next, we turn to the Bertuccis' argument that the trial court abused its discretion by granting the government's request for an "immunity instruction" for Morel Fry, a government witness and the younger sister of Norah Bertucci. Fry's testimony was relevant to the government's "net worth analysis" of Defendants' finances. If the taxpayer's net worth at the end of a period exceeds that at the beginning of the period, and the increase cannot be attributed to reported income, an inference may be drawn that there is unreported taxable income. *See United States v. Marrinson*, 832 F.2d 1465, 1469 (7th Cir.1987). Part of the government's case was that one of the ways that the Bertuccis concealed the true source of their income was by creating false loans from Fry. The Bertuccis reaped another benefit from the arrangement as well. Because the initial loan required repayments at 19% interest and the subsequent loan required interest payments at 17% and 15%, the Bertuccis could take a tax deduction for the interest paid on these loans.

Fry's testimony, therefore, was important to the government's case, but she refused to testify on the grounds that her answers might tend to incriminate her. Consequently, Fry testified on behalf of the government before the grand jury and during the trial under a grant of immunity. She told the jury that, in July 1982, Joseph Bertucci asked her to lend him money. Despite the fact that Fry worked as a librarian or a library administrator averaging $18,818 per year, she "loaned" her brother-in-law $53,400. When challenged as to her ability to come up with this amount, Fry indicated that she had saved $25,000 from her salary and that she obtained the remainder from her mother. She was questioned closely about this considerable financial "cushion" in light of her salary, bank transactions, and funds she had borrowed from her stepfather to purchase a car that remained unpaid.

Fry basically was a hostile witness. The government requested and received the standard Seventh Circuit jury instruction regarding immunized witnesses:

> You have heard testimony ... from Morel Fry who received immunity. That is a promise from the government that any testimony or other information [she] provided would not be used against [her] in a criminal case. You may give [her] testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care.

*See* Federal Criminal Jury Instructions of the Seventh Circuit § 3.19 (1980). At trial, and in this appeal, the Bertuccis argued that the immunity instruction is a "defense instruction" that should not have been given because it improperly bolstered the government's case. They argue that it is unfair for the government to grant a witness immunity and then ask for an instruction that the testimony should be considered suspect because it was given under a grant of immunity. Defendants failed to object to the same immunity instruction given with regard to the testimony of Michael Kostal, a bookstore employee who also testified on behalf of the government under a grant of immunity. Kostal's testimony was that there was a pattern of skimming at LOK, Inc. We thus understand Defendants' argument to be that the government somehow undermined their case by attacking the credibility of the witness who gave evidence in their favor.

It is true that the immunity instruction ordinarily is a "defense instruction." After all, only the government can grant immunity to gain testimony from a recalcitrant witness. *See* 18 U.S.C. §§ 6002, 6003. Here, however, Defendants had no reason to ask for the instruction because they benefitted from Fry's immunized testimony, in that it corroborated their claim that she loaned Joseph Bertucci a sizable sum of money in currency at about the time he and Lawrence went into the adult bookstore business. Instead, it was the government who asked the jury to consider its own witness's testimony with a greater degree of caution than that of other witnesses. Although it is somewhat unusual for the government to ask for such an instruction, we do not find the practice troubling. An immunized witness may have a strong motive to falsify. Rule 607 of the Federal Rules of Evidence provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him." Furthermore, the government's request of the immunity instruction did not serve to deprive Defendants of exculpatory evidence necessary to present an effective defense. Even if the immunity instruction had not been given, it is not unfathomable that the jury would have disbelieved that an $18,000-a-year librarian would have loaned her brother-in-law $53,400 to open an adult bookstore, and the immunity instruction did not improperly suggest to the jury that it do so.

■ Jury instructions must be reviewed in their entirety and be taken as a whole, *United States v. Ruiz*, 932 F.2d 1174, 1179–1180 (7th Cir.1991), and we will not interfere if the instructions treated the issues fairly and adequately. *United States v. Durades*, 929 F.2d 1160, 1167 (7th Cir. 1991). Immunized witnesses receive a benefit for their testimony, and their testimony may be colored. Even if, as here, the testimony of an immunized witness unexpectedly runs in favor of the defense, a trial court does not abuse its discretion by advising the jury to view it with "caution and great care." The jury's function of assessing credibility and weighing testimony is aided by such an instruction, regardless of who requests it.

■ Defendants' final challenge is to their sentences. They contend that the trial court abused its discretion by considering for purposes of sentencing conduct for which Defendants had been acquitted at trial. Out of a total of twenty-five counts in the original indictment, Defendants were acquitted on fourteen counts, including all charges relating to filing, or aiding or assisting in the preparation of, false tax returns for L & B Enterprises, and filing false joint individual income tax returns. Norah Bertucci was acquitted on two counts involving corporate returns. Prior to sentencing, Defendants objected to the inclusion of information in their presentence reports regarding the offenses of which they had been acquitted. Defendants unsuccessfully argued—as they do in this appeal—that because the facts supporting the acquitted charges were in dispute, the district court's consideration of these facts under a standard of proof less than beyond a reasonable doubt vitiated the jury's verdict.

On appeal, the district court disagreed, stating that it had broad discretion to consider for purposes of sentencing *all* the evidence presented at trial. *United States v. Bertucci*, 730 F.Supp. 1483, 1488 (E.D. Wis.1990). It based its conclusion upon the express language of section 3661 of Title 18 of the United States Code, which states "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Section 3661, as well as its predecessor, § 3577 (originally enacted as 18 U.S.C. 3577 (1984)), are applicable to offenses committed prior to November 1, 1987. The court also relied upon several of our opinions, including *United States v. White*, 888 F.2d 490 (7th Cir.1990); *United States v. Marshall*, 719 F.2d 887, 891 (7th Cir.1983) ("there is little limit on the type of information the district court can consider in sentencing"); *United States v. Ray*, 683 F.2d 1116, 1120 (7th Cir.) (only limit on type of information is "due process limitations on the degree to which the judge may rely on convictions obtained without the benefit of counsel, or convictions based on materially false or unreliable information"), *cert. denied*, 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982); and *United States v. Cardi*, 519 F.2d 309, 311 (7th Cir.1975) (sentencing judge has "wide discretion"). The district court noted that before imposing sentence, it had viewed the trial evidence in its entirety. Denying Defendants' assertion that the sentencing procedure was a "one-man retrial," *Bertucci*, 730 F.Supp. at 1488, the court indicated that it merely considered the same evidence presented at trial, but under the less stringent evidentiary standard.

Against all this, Defendants point to language in *White* that suggests that a judge ought not to undermine a jury's verdict of "not guilty" by considering facts underlying an acquittal for purposes of sentencing: "[I]t might make sense to treat an acquittal as a bar in order to avoid both nice questions of proof and the appearance of inconsistency." 888 F.2d at 499. *White* was a Sentencing Guidelines case and involved a completely different issue: may drugs that were not part of the offense of which the defendant was convicted but that were part of the same course of conduct as the offense of conviction be used to compute the sentence? The answer to that question was "yes," and we decline the invitation to extend *White's* dicta to the facts of this pre-Guidelines case. We note that before the enactment of the Guidelines, "judges routinely took related bad acts into account when imposing sentence." *Id.* at 496. For example, in *Cardi*, we stated that an "acquittal does not preclude the district court from considering the information concerning [the defendant's] association with these activities" for purposes of sentencing. 519 F.2d at 314 n. 3. Indeed, a sentencing court may consider uncorroborated hearsay that the defendant has had an opportunity to rebut, illegally obtained evidence, and evidence for which the defendant has not been prosecuted. *United States v. Plisek*, 657 F.2d 920, 926–27 (7th Cir.1981). *See generally* Burke, *Limitations, Under Federal Constitution's Guaranty of Due Process of Law, as to Consideration of Personal Information about Accused in Imposition of Initial Sentence for Criminal Offense—Federal Cases*, 63 L.Ed.2d 872 (1980).

The information the district court considered in this case was tested and found reliable by "the crucible of cross-examination." *Id.* The information was relevant, and the court reasonably believed that it was reliable and accurate. Thus, the consideration of the information for sentencing purposes was proper, and the resulting sentence was not a denial of due process, particularly when the sentences imposed did not exceed the statutory maximum penalties.

For all the foregoing reasons, the Defendants' convictions and sentences are, in all respects, AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I join the principal opinion and the judgment of the court. The question of whether a sentencing judge may consider the

underlying facts of a charge which resulted in an acquittal of the defendant is a difficult and troublesome one. Although the case law is hardly a seamless garment, it does appear, as the principal opinion suggests, that this circuit has joined the majority of other circuits in holding that the sentencing judge may consider such information. As the principal opinion notes, we expressed approval of the majority position in *United States v. Cardi*, 519 F.2d 309, 314 n. 3 (7th Cir.1975). Among our more recent reiterations of this principle, the language in *United States v. Fonner*, 920 F.2d 1330, 1332 (7th Cir.1990), is perhaps the most succinct:

> Nothing in either the guidelines or the Constitution prevents a judge from taking account of conduct in which the defendant engaged, whether or not an acquittal prevents the imposition of criminal penalties directly on that conduct. A verdict of "not guilty" does not mean that the defendant didn't do it; it means that the prosecution failed to establish culpability beyond a reasonable doubt.

On the other hand, in *United States v. Perez*, 858 F.2d 1272, 1277 (7th Cir.1988), this court appeared to limit the general rule when it wrote that "this court has upheld the trial court's consideration of a prior acquittal as long as the acquittal is not relied upon to enhance the sentence." Furthermore, as the principal opinion points out, in *United States v. White*, 888 F.2d 490, 499 (7th Cir.1989), a panel of this court suggested in dicta that "it might make sense to treat an acquittal as a bar in order to avoid both nice questions of proof and appearance of inconsistency." Moreover, recently, in *United States v. Brady*, 928 F.2d 844, 851 (9th Cir.1991), a panel of the Ninth Circuit has held that "[w]e would pervert our system of justice if we allowed a defendant to suffer punishment for a criminal charge for which he or she was acquitted."

While the holding of the Ninth Circuit and the dicta in some of the opinions in this circuit raise serious doubts, and might even carry the day if this were a matter of initial impression and a matter purely within the cognizance of the judiciary, I believe that Chief Judge Wallace was correct in his partial dissent in *Brady* when he noted that the statutory mandate of 18 U.S.C. § 3661 as well as the doctrines of stare decisis and precedent require affirmance here. *See* 928 F.2d at 854–57 (Wallace, C.J., concurring in part and dissenting in part). The Supreme Court has already granted certiorari in several cases raising analogous questions. *See, e.g., United States v. Williams*, 910 F.2d 1574 (7th Cir. 1990), *cert. granted,* — U.S. —, 111 S.Ct. 1305, 113 L.Ed.2d 240 (1991); *United States v. Braxton*, 903 F.2d 292 (4th Cir.), *cert. granted,* — U.S. —, 111 S.Ct. 426, 112 L.Ed.2d 410 (1990). If *Brady* is the preferable view, the Supreme Court shall tell us in due course. In the meanwhile, we ought to follow, as the principal opinion does, the plain wording of the statute and the weight of authority.